**Jose LEON, Petitioner,**

**v.**

**Robert H. KUHLMANN, Superintendent of Woodbourne Correctional Facility, Respondent.**

**No. 76 Civ. 5460 (HFW).**

United States District Court,
S. D. New York.

June 20, 1977.

---

Prisoners' Legal Services of New York,
New York City, for petitioner; Eric R.

Neisser, Amanda Potterfield, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for respondent; Ilene P. Karpf, Deputy Asst. Atty. Gen., New York City, of counsel.

## MEMORANDUM DECISION

WERKER, District Judge.

The petitioner in this action, Jose Leon ("petitioner"), was convicted of the crimes of possession of a weapon as a felony and possession of a dangerous drug in the fourth degree on February 7, 1974, after a six-day jury trial in Supreme Court, New York County, before the Honorable Morris Aarons. Thereafter, petitioner was sentenced to concurrent six-year terms of imprisonment.[1] The Appellate Division, First Department, affirmed his conviction without opinion,[2] and leave to appeal to the Court of Appeals was also denied without benefit of a written explanation.[3] Petitioner is presently incarcerated at the Woodbourne Correctional Facility, where respondent Robert Kuhlmann is the superintendent, and now makes application to this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1970), principally on the ground that prosecutorial misconduct and judicial error at trial combined to deprive him of his right to due process of law under the fifth and fourteenth amendments to the United States Constitution.[4] For reasons set forth in detail below, petitioner's application is denied herein.

### I

Since petitioner elected not to testify at trial in view of his prior criminal convictions and also presented no case of his own, the uncontradicted testimony of the prosecution witnesses established the following:

During the early morning hours of Thursday, July 12, 1973, petitioner had an argument with an unidentified individual seated near him in the rear of the "El Gallo de Morou" bar, located on upper Broadway, between 164th and 165th Streets, in the borough of Manhattan. Manuel Jimenez ("Manuel"), the manager of the bar, warned the two not to settle their differences in his establishment and they both returned to their respective bar stools. Petitioner then ordered another drink, but left the bar some five minutes later without bothering to finish it.

Approximately ten or fifteen minutes thereafter, petitioner returned in a taxicab and walked up to the front door of the bar. In his right hand, he held a shopping bag. As he attempted to open the door to the bar, Manuel blocked his path and told him that he would not permit him to go inside. Petitioner said to Manuel that his disagreement was not with him, but "with the one who is inside;" he then placed his shopping bag against Manuel's chest and told him that he, Manuel, would be killed if he didn't move. At that time Manuel saw the butt of a rifle protruding from the open end of the shopping bag. Manuel therefore turned from the doorway, but when petitioner began to move inside Manuel grabbed his right wrist from behind. After a brief struggle, Manuel managed to wrestle petitioner to the sidewalk.

During the course of the struggle, other individuals came out of the bar, among them Manuel's brother, Norberto Jimenez

---

1. The jury found petitioner not guilty on two counts of assault in the second degree; two further counts of assault in the first degree were withdrawn from the jury's consideration pursuant to a motion by the prosecutor.

2. *People v. Leon,* 53 A.D.2d 809, 384 N.Y.S.2d 714 (1976).

3. *Id.,* 40 N.Y.2d 850, 387 N.Y.S.2d 1041, 356 N.E.2d 487 (1976).

4. Petitioner's *pro se* petition was first received by the United States District Court for the Southern District of New York on December 1, 1976. Thereafter, Prisoners' Legal Services of New York undertook petitioner's representation and an amended petition was filed in his behalf. Only the amended petition is considered in this decision of the court.

("Norberto"), and Ignacio Diaz ("Ignacio"), a customer at the bar. Both Norberto and Ignacio were injured by shots discharged from the rifle before the shopping bag in which it was contained could be separated from petitioner's hand. However, despite his injury, Norberto then restrained petitioner while Manuel went to lock the bar and phone the police.

This was the scene that police officers observed upon responding to a 3:13 a. m. radio call of gun fire on upper Broadway. Petitioner lay spreadeagled on the sidewalk and was still struggling to escape from Norberto's hold. There were ten or twelve bystanders in the vicinity. Ignacio, one of the bystanders, was extremely noticeable because he was wearing a blood-stained outfit and appeared to be bleeding profusely.

The officers separated Norberto from petitioner who was then handcuffed and searched for weapons. However, since some of the individuals at the scene plainly required immediate medical attention, the surrounding area was only examined cursorily. Nevertheless, not far from where petitioner had been found, the officer conducting the search did manage to recover the rifle (which was still contained in the shopping bag) and two shell casings.

Ignacio and Norberto were rushed to the emergency room at a nearby hospital, and the first two officers on the scene ("arresting officers") subsequently brought petitioner there in a separate radio car. Once petitioner was in the emergency room, one of the arresting officers read him his rights under *Miranda*[5] and proceeded to search him for contraband. In petitioner's pocket, the officer found a plastic bag and a folded dollar bill, each of which contained a quantity of white powder later established to contain cocaine.

Thereafter, petitioner was treated at the hospital for a cut on his scalp and an abrasion on his thigh.

Through extensive and often repetitive cross-examination, defense counsel sought to suggest to the jury a markedly different version of the incident in question and one which was supported by neither logic nor evidence. Thus, prosecution witnesses were frequently asked to admit that petitioner never left the bar after the argument; that the altercation therefore took place in the bar; that petitioner was the victim of the attack rather than its cause; that petitioner was subsequently removed to the sidewalk, where the rifle and spent cartridges were placed by his side; and that cocaine was planted on his person, either while he was lying on the sidewalk or upon his arrival in the hospital's emergency room. Each of these propositions was rejected by the witnesses.

## II

Petitioner's principal contention is that the prosecutor violated petitioner's constitutional right to due process of law by using evidence of his post-arrest silence on three separate occasions during the People's direct case and by referring to it during summation.

The first adverse comment on petitioner's failure to make exculpatory statements at the time of, or shortly after, his arrest occurred during redirect examination of Detective Frank Morrow, one of the arresting officers, who was asked the following:

Q Officer, when you arrived at the scene, did you interview the people who were shot in this case, the complaining witnesses?

A Yes, I did.

Q And at that time did [Norberto and Ignacio] explain to you what happened?

. . . . .

A Yes, they did.

Q Was the defendant there?

A Yes, he was.

Q Did the defendant say anything after the accusations were made?

A No, he did not.

Q Did the defendant make any mention of the fact that he had been shot at the scene?

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A   No, he did not.

Q   Did the defendant make any mention to you of cocaine in his pocket at the scene of the crime?

A   No, not at the scene.

Transcript at 233–34. Similarly, the jury heard the following testimony on redirect examination of Sergeant Spivey, the other arresting officer:

Q   Going back to the cocaine, you were in the hospital 15 minutes, and the defendant was in your presence.

Did he ever, at any point in time, prior to the time the officer reached into the pocket and took the cocaine out of it, mention anything to you about cocaine?

A   The defendant?

Q   Right.

A   No.

Transcript at 300–01. Sergeant Spivey was also asked the following:

Q   Officer, from the time the defendant was arrested in this case until the arrest process was completed, or, I believe, you left the hospital an hour or two later, was the complaining witness [sic] ever making any mention of the fact or did he ever accuse anyone of shooting him?

A   No, he did not. He made mention of the fact he had an injury on his leg, but he never indicated that anyone had shot him.[6]

Transcript at 308–09.

█     In each instance defense counsel objected to the line of questioning, but these objections were never phrased in constitutional terms. The court did not strike the objectionable testimony and it gave no cautionary instructions to the jury inasmuch as none had been requested.[7]

Lest the desired inference escape the jury's grasp, the prosecutor also made it quite clear in his summation why he thought that the petitioner's post-arrest silence was a matter of some importance. Thus, he stated that:

[t]he defendant is placed, hancuffed right there at the scene. Something interesting is going on. Did the defendant ever say somebody planted cocaine on him? Does he ever tell Sgt. Spivey, who was just here, that anybody is planting anything on him? Does he ever mention anything about anything going on inside the bar? Why not? He didn't think about that then. He only thought about it recently.

Transcript at 412–13.

It is clear that the prosecutor's statements, would constitute error of constitutional magnitude, under the recent Supreme Court decision in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), if they were to be made during a trial taking place in state court today. In the *Doyle* case, petitioners were arrested for selling illegal narcotics to a government informant. At separate trials, they each conceded virtually every element of the State's case upon taking the stand. Thus, they admitted (1) that they had met with the informant, (2) that $1320 had exchanged hands and (3) that ten pounds of marijuana had then been found in the informant's truck. But they did not agree with the contention of the State that these facts evidenced a completed transaction by which they sold the informant ten pounds of marijuana. Rather, each petitioner steadfastly maintained that the initial arrangement had been for the informant to sell one of them a quantity of narcotics for $1750, that the proposed purchaser subsequently decided to purchase but a fraction

---

**6.** It is clear, in context, that the prosecutor's question and the witness' response are directed to the actions of the petitioner, not one of the complaining witnesses.

**7.** While counsel's failure to make the proper objection at trial may often preclude state appellate review, absent some suggestion that there has been a deliberate bypass of state court procedure, *Fay v. Noia,* 372 U.S. 391, 438,

83 S.Ct. 822, 9 L.Ed.2d 837 (1963), habeas corpus relief is not foreclosed. *See Minor v. Black,* 527 F.2d 1, 4–5 (6th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3189–90, 49 L.Ed.2d 1198 (1976), and cases cited therein. Here, there is no suggestion that defense counsel knowingly waived his constitutional objection, and the court is therefore able to consider this aspect of the petition.

of the agreed amount and that this revelation angered the informant, who threw $1320 into their vehicle and took all of the marijuana back to his truck. As the Court noted, petitioners' explanation "was not entirely implausible and there was little if any direct evidence to contradict it." *Id.* at 610, 96 S.Ct. at 2242.

In an attempt to impeach their credibility, the prosecutor questioned the petitioners about their failure to mention the alleged frameup at the time of their arrest. Timely objections by defense counsel were overruled, and on appeal the intermediate appellate court affirmed the convictions, holding that the challenged questions properly raised the "credibility of the witness." *Id.* at 616, 96 S.Ct. 2240. The Supreme Court of Ohio declined to review this decision. *Id.*

Resting its decision upon the practical effect of its earlier holding in *Miranda v. Arizona, supra,* the *Doyle* court found that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Id.* at 618, 96 S.Ct. at 2244. Accordingly, it held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245.

Here, too, testimony concerning petitioner's post-arrest silence could only have served to encourage negative and constitutionally unacceptable inferences by the jury. Even more egregiously, the prosecutor here sought to introduce such inherently prejudicial testimony as part of the State's case in chief and not in response to potentially contradictory evidence offered by the petitioner, a situation in which one could at least argue that its use was a matter of necessity. *See id.* at 616, 96 S.Ct. 2240 (rejecting that very argument).

The State argues that *Doyle* is inapplicable to much of the testimony concerning petitioner's silence here because it involved the period of time before he was informed of his rights under *Miranda.* That argument is plainly foreclosed, however, by the Supreme Court's opinion in *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), a forerunner to the *Doyle* case which was decided under the Supreme Court's supervisory power over lower federal courts.

In *Hale,* the respondent was arrested for robbery after a brief street chase, but was only advised of his right to remain silent after being taken to a police station where he was searched. Testifying in his own defense, the respondent contended that money found on his person during the search had come not from the robbery victim, but from another source. Because "the prosecutor caused [him] to admit on cross-examination that he had not offered the exculpatory information to the police *at the time of his arrest,*" *id.* at 174, 95 S.Ct. at 2135 (emphasis added), the Court held that he was entitled to a new trial.

■ Justice Marshall, writing for the majority, did not ground his opinion on the effect of *Miranda* warnings upon the mind of an accused; rather, he observed that:

At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. See Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U.Chi.L.Rev. 657, 676 (1966). He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In sum, the inherent pressures of in-custody interrogation exceed those of questioning before a grand jury and compound the difficulty of identifying the reason for silence.

*id.* at 177, 95 S.Ct. at 2137. Similarly, in *Doyle* the Court cited *Hale* for the proposition that:

Silence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings, for in a given case there may be several explanations for the silence that are consistent with the existence of an exculpatory explanation.

*Doyle v. Ohio, supra,* 426 U.S. at 618 n. 8, 96 S.Ct. at 2244 n. 8. The court therefore considers petitioner's silence here, which occurred after arrest but before recitation of the *Miranda* warnings, to be "insolubly ambiguous" and, therefore, an improper area for the prosecutor to have explored.[8] As petitioner correctly observes, any other holding in this regard would invite police officers to delay administration of the warnings mandated by *Miranda* solely to encourage the trier of fact to reach adverse inferences from the silence of an accused. This the court cannot allow.

The prosecutor also committed error of constitutional magnitude in summation, by asking the jury:

> Who is the defendant? Most of you have been sitting directly opposite him for the past week and you have had an opportunity to view him. Is he a welder? Does he get up in the morning to go out to the factory to support his wife and family? Does he work for Con Edison?

Concededly, the prior summation by defense counsel more than invited a vituperative response from the prosecutor,[9] but it cannot fairly be denied that the prosecutor's remarks exceeded the bounds of fair rejoinder, *see United States ex rel. Leak v. Follette,* 418 F.2d 1266 (2d Cir. 1969), *cert.*

*denied,* 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1950); *Baker v. United States,* 115 F.2d 533, 544 (8th Cir. 1940), *cert. denied,* 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941), for they related to the absence of testimony which would only have been relevant had petitioner chosen to take the stand. Such direct comment on a defendant's failure to testify cannot be sanctioned. (Compare *Bishop v. Wainwright,* 511 F.2d 664, 668 (5th Cir. 1975), where the prosecutor restricted his remarks to comments on the defendant's in-court demeanor.)

### III

Under the circumstances of this case, however, the court considers the unfavorable statements heard by the jury to be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Williams,* 523 F.2d 407, 409–10 (2d Cir. 1975). Petitioner's application for a writ of habeas corpus is, therefore, denied on that ground, and the State's argument that *Doyle* should not be applied retroactively need not be reached.

The evidence presented to the jury, quite simply, was overwhelming and precludes any possible doubt as to petitioner's guilt. The jury heard the testimony of Manuel, Norberto and Ignacio, three eyewitnesses to the crimes charged in the indictment who agreed without material contradiction in their testimony as to each significant element of the State's case. And their testimony was buttressed by that of the arrest-

---

**8.** Although the State apparently argues that petitioner was not arrested in front of the bar, both of the arresting officers conceded that he was handcuffed and arrested at that location. Transcript at 171, 265.

**9.** During his summation, defense counsel commented extensively on the veracity of Norberto, Manuel and Ignacio, the first three witnesses to testify, noting among other things that:

a. "The first three witnesses who said they said what they saw. They were not telling the truth." Transcript at 377.

b. "They didn't tell any truth, because it never happened outside that bar. They not only lied about the individual, little facts that

I am showing you about, but they lied about every thing . . . ." Transcript at 396.

c. "Maybe I could put it this way. These men were lying. The three witnesses on that stand were lying. Two were pawns and the one in the middle, the big one, he was lying." Transcript at 398.

Since an attorney should not assert his personal opinion as to the credibility of a witness, ABA Code of Professional Responsibility, Disciplinary Rule 7–106(C)(4), *found in* New York Judiciary Law (McKinney 1975), at 492–93, it is this court's view that defense counsel's comments crossed the often thin line between proper comment on the evidence and unprofessional conduct.

ing officers, who noted nothing at the scene of the incident which would have suggested that the complaining witnesses were offering a fictitious version of what actually occurred. Moreover, while one of the arresting officers unthinkingly discarded the shopping bag carried by petitioner before vouchering the rifle which it had contained, both the rifle and ammunition and the confiscated narcotics were introduced into evidence at trial, and at the jury's request the rifle was made available for further inspection.[10] There was therefore more than enough evidence to support the jury's conclusion that the rifle was of a size which may be concealed upon the person[11] and that petitioner had had dangerous drugs in his possession.[12] Finally, while defense counsel sought to suggest that petitioner had been the victim of both knife and bullet wounds sustained during an attack, the physician who examined him after the incident rejected both of these contentions.

## IV

The court has considered petitioner's remaining arguments and finds that they present no constitutional issues of substance.

█ Petitioner first contends that the prosecutor commented impermissibly on his failure to testify at trial by stating that:

> [t]here have been no facts or evidence offered to contradict [the] testimony [of Ignacio, Noberto, Manuel and the arresting officers], not a bit of evidence offered to contradict it, not even the smallest scrap. It's easy to talk about but it's very difficult to come up with the evidence.

But it was actually defense counsel that first raised the question of petitioner's failure to take the stand in his own behalf.

> Briefly, let me explain something: Jose Leon didn't take the stand today. As I said before, you can't take any inferences from that whatsoever, except the fact he didn't take the stand. For a little bit of insight realize the fact of that matter. Here is a man who is charged with a crime that he did not commit and everybody is testifying against him and he knows that no matter what he says on the stand it can't be accepted. He feels that all he could do is get into more trouble and he is going to rest on the District Attorney's own case because the District Attorney didn't prove a case. The Constitution, for that very reason, gives Jose Leon that right not to get on that stand, because Jose Leon has nothing to add to the story.

Transcript at 392–93. In view of defense counsel's lengthy comment on his client's reluctance to testify, it is most difficult to see how the prosecutor's brief statement can be considered improper. More importantly, however, throughout the trial and indeed in his summation, too, defense counsel repeatedly offered petitioner's version of the facts to the jury without having established any evidentiary predicate. The prosecutor's comment therefore seems to have been directed not to petitioner's failure to testify, but rather to his attorney's frequent attempts to do so in his stead. Even if this was not the case, the court holds that the prosecutor's statement was still well within

**10.** Petitioner apparently suggests that because the rifle recovered from the scene of his arrest was 19 and ½ inches long, *see* Transcript at 321, it was, as a matter of law, too large to be of a size which may be concealed on the person. *E. g., People v. Raso,* 9 Misc.2d 739, 170 N.Y.S.2d 245 (Kings County Ct. 1958). Under New York law, however, any person possessing a loaded firearm outside of his home or place of business and without a license is guilty of a crime. New York Penal Law § 265.05(2) (McKinney 1967). And the definition of a firearm expressly includes any "sawed-off shotgun or other firearm of a size which may be concealed upon the person." *Id.* § 265.00(3).

Thus, it has been held that the concealability of a sawed-off shotgun raises a triable issue of fact, *People v. Roberts,* 79 Misc.2d 243, 360 N.Y.S.2d 151 (App.Term 1974), and a sawed-off rifle 16 inches long has been held to be potentially concealable, *People v. Caffrey,* 73 Misc.2d 504, 342 N.Y.S.2d 754 (Crim.Ct.N.Y.1973).

**11.** In this regard, a ballistics expert testified that the rifle was operable. Transcript at 326.

**12.** A police department chemist confirmed that the white powder taken from petitioner's person contained cocaine. Transcript at 241–255.

the bounds of fair comment on the strength of the evidence. *United States v. Persico,* 425 F.2d 1375, 1386 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); *United States ex rel. Harden v. Follette,* 333 F.Supp. 371, 382 (S.D.N.Y. 1970), *aff'd,* 450 F.2d 879 (2d Cir.), *cert. denied,* 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286 (1971). As Judge Wyzanski recently observed for the Second Circuit in *United States v. Rodriquez,* 556 F.2d 638, at 642 (2d Cir. 1977), "the prosecutor has a right to show how strong is his case, even if it be true that it appears that a defendant's failure to take the stand or to offer evidence has left him facing a demonstration of Euclidean inevitability."

Several other contentions are raised with regard to the contents and tenor of the trial judge's charge and supplemental instructions to the jury.

■ In response to a question from the bench,[13] defense counsel requested that the court address in its charge petitioner's failure to testify. Accordingly, the court instructed the jury as follows:

> In this case the defendant has not testified on his own behalf and I now charge you, as a matter of law, that the fact that he did not testify is not a factor in which any inference unfavorable to the defendant may be drawn.[14]

Transcript at 440. Petitioner maintains that this instruction gave insufficient attention to his privilege against self-incrimination, since it was "sandwiched . . . between statements emphasizing the importance of prosecution witnesses and discounting the presumption of innocence and the privilege against self-incrimination." Yet petitioner does not contend that it incorrectly stated the law. (*See* Petitioner's Memorandum of Law at 22.) Since it is well established that a court need not expound at length on a criminal defendant's

fifth amendment privileges in its charge, *People v. Carlton,* 48 A.D.2d 775, 369 N.Y. S.2d 137 (1st Dep't 1975), I see no reason to find fault with the instruction given. Indeed, had Justice Aarons spent more time on this aspect of his charge, petitioner could, and no doubt would, argue that excessive emphasis had been placed on his failure to testify at trial.

■ Petitioner also contends that the court lowered the necessary standard of proof below the constitutional threshold by instructing the jurors that

> [i]f after carefully considering the evidence as a result of reason or judgment or because of the evidence in the case or lack of evidence, you feel in your hearts and conscience that the defendant did not do the thing charged against him under the law as explained to you, or if you entertain a reasonable doubt as to his guilt, then there exists a reasonable doubt and you should give the defendant the benefit of that doubt and acquit him.

Transcript at 439. Petitioner argues that the jurors could have found him guilty under this aspect of the instructions given them solely because they felt in "their hearts and conscience" that he was. If it is read fairly, however, the charge appears to suggest quite the opposite, that petitioner could be acquitted, despite the absence of reasonable doubt as to his guilt, if the jurors' "hearts and conscience" caused them to reach such a verdict.[15] Therefore, while the trial court's instruction may well have been prejudicial, petitioner most assuredly is not the party aggrieved. And even if he is, the trial court's other instructions on burden of proof belie any suggestion that the jurors could have applied an incorrect standard in arriving at their verdict.

Petitioner further contends that the court compounded the errors previously considered by giving two supplemental instruc-

---

13. Transcript at 423.

14. Under New York Criminal Procedure Law § 300.10(2) (McKinney 1971), if a defendant who did not testify in his own behalf requests, the court must give an instruction to this effect.

15. Indeed, in attacking the credibility of prosecution witnesses, defense counsel himself asked the jurors whether there wasn't a reasonable doubt "in every one of [their] hearts and minds."

tions which effectively removed material elements of the substantive offenses from the jury's consideration, in contravention of his right to trial by jury and due process of law.

During the first day of deliberations, the jury indicated that it wished to inspect the firearm introduced into evidence; it also asked further for a rereading of the fourth count of the indictment, which charged that petitioner intentionally caused physical injury to Norberto "by means of a deadly weapon, to wit, a loaded sawed-off rifle." When the court responded to these requests in open court, one of the jurors suddenly asked Justice Aarons whether he could "clear it up as [to] the point of hidden on your person?"

In response to this question, Count Five of the indictment, which charged petitioner with unlawful possession of a loaded firearm, was reread to the jury. That count stated that:

> "The defendant in the County of New York, on or about July 12, 1973, had in his possession a firearm, to wit, a sawed-off rifle of a size which may be concealed on the person, loaded with ammunition."
>
> \* \* \* \* \* \*
>
> "Said possession not being present in the defendant's home or place of business[.]"

Transcript at 469–70. Justice Aarons then went on to observe as follows:

> Well, it's a sawed-off rifle, you see that. In other words, the parts are cut down to be made smaller and generally, they find from experience, that is done so it can be concealed. In other words, you are not walking with a big rifle in the street, which you might be permitted to walk with, if you have a license or in some part of New York State. So that's a firearm and if it is cut down it can be concealed, because any weapon that can be concealed becomes a firearm. Now, the question that you are raising is whether that can be concealed on the person compared to a gun from which it was sawed off from?
>
> You may take into consideration concealed on the person, what he could do

with it and that's for you to determine. That's why we will give you the gun. You may also take into consideration that this person was carrying this not in a gun case. Now, if he was carrying it in a gun case it would be apparent, so it wouldn't be concealed, but it's been held and you might find it that way, but carrying it in a bag where he had possession of the bag, that would be concealment on the person.

> If you find that, you know, you got to find all these things before you get into concealment.

Transcript at 470–71.

On the second (and final) day of deliberations, the jury asked for an explanation of the term "knowingly" in count six of the indictment, which charged unlawful possession of a dangerous drug. When the jury returned to the courtroom, the following discussion ensued:

> [THE COURT:] I will give you the definition as given to us by the Penal Law, which says: "Knowingly: A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense, when he is aware that his conduct is of such nature or that such circumstances exist."
>
> I would say that the term knowingly is restricted to the awareness of the nature of one's conduct or the existence of certain acts or circumstances. The term knowingly imports a knowledge that the facts exist, which constitute the fact or omission, a crime it does not require knowledge of the unlawfulness of the act or omission. I will read the definition over again. The definition is a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. The term knowingly is restricted to awareness of the nature of one's conduct or of the existence of specified facts or circumstances.
>
> In other words, under the statute, under six, that he had the packet in his

pocket and that it was cocaine. Now, they say that having it in his pocket could be knowingly, he could know of it. He has to have knowledge. You figure out for yourselves the knowledge he had about the packet allegedly in his pocket. I think that's what you are referring to. I use the word allegedly, I can't say in his pocket because that is making a decision. Forget the alleged. You are making the decision. I use the word alleged because I am not allowed to say anything.

JUROR NUMBER 6: If I may speak and ask a question? Having it in a person's pocket, would you assume it is knowingly or not?

THE COURT: That is your job. I'm not going into it. This man was found to have it in his pocket when they examined. Let's assume you find that, for example. Now, when a person has something in his pocket, using common sense, what does that mean to normal person? Did it get there out of the sky, or did it get there some other way? Is there any evidence you can place it on; is there any inference out of the evidence? You can make inferences, but it has to be based on a fact. I charged you on circumstance. In other words, there is the fact that exists that doesn't give you a final answer, but there is an inference. It has to be based on fact. You say this happened. What is the inference from it? The police testified it was in his pocket. If you believe it was in his pocket, then you make the inference from that. Like I say here—I will say it once more. The term knowingly is restricted to awareness of the nature of one's conduct. That part of the conduct is: Does he have it in the pocket or know of the existence. I will read it to you once more.

JUROR NUMBER 3: Could you read count six for us?

(Whereupon, count six of the indictment was read by the Court.)

THE COURT: I charge you it is unlawful if you have a narcotic, if you are not licensed, if you are not authorized—like a manufacturer is authorized, the trucker, the drug control, he is allowed to carry it. People who have prescriptions are allowed to have it. If it is prescribed for them. But there is no evidence of that in this case. He is not licensed or authorized as far as this case is concerned, and there is no evidence of any prescription. So, if you find that he had cocaine, then he had it unlawfully. Knowingly would be that he knew it was in his pocket. That he had the packets in his pocket. You can infer from the fact that it was in his pocket that he knew it, but you have to do it. I can't do it.

Transcript at 475–78.

■ With respect to the first supplemental instruction, in his appeal to the Appellate Division petitioner apparently argued that the trial court erred by telling the jury that rifles are generally cut down to aid in their concealment, *see People v. Trucchio,* 47 A.D.2d 934, 367 N.Y.S.2d 76 (2d Dep't 1975), and the district attorney readily conceded that point. Exhibit I to Petitioner's Memorandum. However, that is not a sufficient basis for habeas corpus relief, absent some showing that the error was so fundamental that it amounted to a denial of petitioner's constitutional right to due process. *Shepherd v. Nelson,* 432 F.2d 1045, 1046 (9th Cir. 1970); *United States ex rel. Winfield v. Cascles,* 403 F.Supp. 956, 958 (E.D.N.Y.1975); *United States ex rel. Johnson v. Vincent,* 370 F.Supp. 379, 384 (S.D.N. Y.1974), *rev'd on other grounds,* 507 F.2d 1309 (2d Cir. 1974), *cert. denied,* 420 U.S. 994, 95 S.Ct. 1435, 43 L.Ed.2d 678 (1975). Petitioner has not met that burden.

Petitioner further contends that the court's supplemental instructions invited the jury to abandon further consideration of the elements to which they were addressed. Indeed, he suggests that the court virtually directed a verdict against him on these elements, thereby depriving him of his constitutional rights. *See, e. g., United States v. Singleton,* 532 F.2d 199, 206 (2d Cir. 1976); *United States v. Hines,* 256 F.2d 561, 564 (2d Cir. 1958). I find this argument to be without merit.

In this regard, I note that a federal district judge may comment on the evidence, for the jury's benefit, provided that his remarks are fair and impartial and that the jury's right to determine issues of fact remains untrammeled. *See, e. g., Horning v. District of Columbia,* 254 U.S. 135, 138, 41 S.Ct. 53, 65 L.Ed. 185 (1920); *United States v. Natale,* 526 F.2d 1160 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). It is difficult to see how this practice can be unconstitutional merely because it is engaged in a different forum. *Tilford v. Page,* 307 F.Supp. 781, 789 (W.D.Okl.1969); *cf. Pavkovich v. Brierley,* 360 F.Supp. 275, 280 (W.D.Pa.1973), *aff'd,* 493 F.2d 1401 (3rd Cir. 1974). Individual segments of the charge may suggest that certain elements were established beyond any reasonable doubt, but this court cannot judge particular instructions in isolation, *Cupp v. Naughten, supra,* 414 U.S. at 147, 94 S.Ct. 396, and must view them as an integrated whole. *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926). When this is done, it is clear that the trial judge carefully identified for the jurors those findings which had to precede any given inference and constantly cautioned them that they, not the court, had the responsibility of determining all questions of fact. Consequently, the trial court responded properly to the jury's request for further instructions and no meritorious questions of constitutional deprivation have been raised.

V

Petitioner's application is therefore in all respects denied.

SO ORDERED.