Radames COPPIN, Petitioner,

v.

Walter T. FOGG, Superintendent of
Eastern Correctional Facility,
Respondent.

No. 80 Civ. 1793 (KTD).

United States District Court,
S. D. New York.

Sept. 16, 1980.

Thomas H. O'Rourke, New York City, for petitioner.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for respondent; Tyrone Mark Powell, Asst. Atty. Gen., New York City, of counsel.

OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge.

The present proceeding is in the nature of habeas corpus brought under Section 2254 of Title 28 United States Code. The petitioner was convicted in the Supreme Court of New York, Bronx County (John J. Riley, Jr., J.) of robbery in the first degree. Judgment was entered on March 10, 1977, on a jury verdict. The court sentenced the petitioner to a prison term of five to ten years as a second felony offender. The petitioner is presently serving his sentence at the Eastern Correctional Facility of which the respondent is superintendent.

The petitioner appealed his conviction to the Appellate Division of the Supreme Court, First Department on May 11, 1978. The Appellate Division affirmed the conviction. Leave to appeal to the Court of Appeals of the State of New York was denied.

Basically, the petition contends that Coppin's constitutional rights were violated during his trial in the Bronx in that the prosecutor commented to the jury that petitioner's silence at the time of arrest was evidence of a guilty mind. It is alleged that this comment violated the petitioner's rights under the fifth amendment to the Constitution as applied to the states under the fourteenth amendment. To understand the petitioner's allegations, it is necessary to have some knowledge of the facts proved at trial. It was alleged, and the jury found, that the petitioner in concert with two others, Robinson Cruz and Silvana Quintana, robbed one Daniel Roach on or about January 22, 1975. On that night, Roach was walking home along Beach Avenue after completing his night shift at the Hess Oil Company. Quintana and Cruz approached Roach. Quintana held Roach against the fence while Robinson Cruz, brandishing a knife, took $10, some change and some eye glasses from Roach. Before fleeing the scene, Cruz cautioned Roach, "Yell and I'll kill you." Across the street saying good-night to his girlfriend was an off-duty patrolman, Efrain Aponte. Aponte went over to Roach who told him about the robbery

and Aponte gave chase to Cruz and Quintana. Aponte said, "Halt. Police." But the two men kept running. When Aponte reached the corner he drew his gun and observed the two men getting into an unlighted white Cadillac with the motor running. Once again Aponte called out, "Police." He thought that one of the suspects appeared to have a gun in his hand. Aponte then saw a flash in the dark and fired his own weapon four times hitting the rear of the suspect vehicle.

The suspects entered the car and drove north on Westchester Avenue. At the same time, two police officers on radio patrol, Michael Greco and Leonard Caruso, were proceeding south on Westchester Avenue. They heard the sound of gun fire, and suddenly the unlit white Cadillac sped north past them on Westchester Avenue.

The officers made a "U" turn and gave chase to the speeding Cadillac. Notwithstanding the flashing lights and screeching sirens, the driver of the Cadillac continued in a high-speed flight at about 80 mph across the Bronx roadway network. The chase continued for about six miles when it finally was halted at Ferry Point Park underneath the Bronx side of the Whitestone Bridge.

At that point, the two officers got out of the car. Cruz started to run away into the park. Officer Caruso chased him and finally captured him after Cruz had attempted to throw away a knife and a $10 bill.

Officer Greco, meanwhile, was holding Quintana and petitioner Coppin at gun point near the Cadillac vehicle. Greco ordered the two of them over toward the wall of the Whitestone Bridge, told them to spread eagle and patted them down for a weapon. Thereafter, all three defendants were transported by Officer Caruso to the 43rd Precinct while Officer Greco drove the Cadillac to the Precinct House.

While at the Precinct House, the petitioner Radames Coppin, apparently only gave the police officers his pedigree and other background information necessary for them to fill out their arrest reports. It is clear that Coppin made no incriminating statements. Apparently, however, one of Coppin's co-defendants made a statement which exculpated Coppin.

Cruz and Quintana were tried separately from the petitioner. At the petitioner Cruz' trial, defense counsel decided not to put the petitioner on the stand in view of the fact that after a *Sandoval* hearing the People would be permitted to cross-examine the petitioner on certain of his prior convictions. Since the petitioner was not going to take the stand, apparently defense strategy was to denigrate the investigation by the police officers.

Thus, the defense asked both Officer Greco and Officer Caruso whether they had asked the defendant for a statement or whether the defendant had volunteered any statement. Defense counsel cross-examined Officer Greco as follows:

Q. Did he at that time say to you, "You got the wrong man; I had nothing to do with this"?

A. No sir.

Q. He didn't say that at all?

A. He didn't say anything at all, no.

Q. Did you say anything to him at that time?

A. Nothing other than, "spread your feet," or normal frisking procedure.

     \*     \*     \*     \*     \*     \*

Q. Did he say anything to you?

A. No.

Q. Nothing?

A. No.

Q. Made no attempts at denials?

     \*     \*     \*     \*     \*     \*

Q. Denials of any reason why he was stopped?

A. No.

Similarly, the defense attempted to interject the exculpatory statement made by one of Coppin's co-defendants and brought out that Coppin and his two co-defendants had chatted amiably after their arrest in Spanish, yet, Officer Aponte, who was Spanish, had not questioned Coppin concerning his participation in the crime.

This line of defense became abundantly clear during the summation when the defense attorney commented:

Nowhere in the record, nowhere in the record is there any testimony that any one of these three police officers asked any of the prisoners any questions. Isn't that strange? When you get into the jury room, do you think that you will ask yourselves and each other what really happened in that precinct, in that police station where three police officers, one of whom is an Hispanic, with three Hispanic prisoners? I asked the two arresting officers, 'Did you have a conversation with them—with the defendant Coppin?' 'No.' 'Did you have a conversation with the other two?' 'No, all we did was we made out the arrest report and we asked them the pedigree questions.' There is a gentleman there by the name of Mr. Roach in the precinct. They told you they met him there. He tells them there has been a robbery on St. Lawrence Avenue. Not one of the police officers says to him anything; 'Did you do it? Did you not do it? What?' Nothing. Is that believable? A man comes in and complains that he's been robbed. Three prisoners are brought in, and we have no testimony, no evidence, that they ever asked anybody what happened. 'Who did it? Who did what?'

During the prosecutor's summation, the Assistant District Attorney made the following reply to the defense argument:

MISS LILES: ... Did he (Coppin) go over to the police officer and say,

'Police officer, listen.' and give some sort of version of what had happened? He didn't say anything. He just stood there. At no time did this defendant give any indication to the police that he—(238–239).

The following then took place,

MR. HORWIN (Defense Counsel): That's objected to, Judge.

THE COURT: Objection overruled. Fair comment on the evidence.

MR. HORWIN: But it's not the proper—

THE COURT: Overruled.

MR. HORWIN: It's not the correct testimony.

THE COURT: Overruled.

MISS LILES: You heard the evidence, ladies and gentleman. At no time did this defendant make any statements as to why or what he was doing in that car, and I submit to you the reason why he didn't do it because this—

MR. HORWIN: Your Honor—

THE COURT: Objection overruled.

MR. HORWIN: I move for a mistrial. I would like a sidebar right now.

THE COURT: Be seated. The objection is overruled. Be seated, please.

MR. HORWIN: I move for a mistrial.

THE COURT: Be seated now. Did you hear what I said to you, Mr. Horwin? You will be seated.

MISS LILES: I submit to you the reason why the defendant made no statements is because the defendant had a guilty mind. (239–240).

From a review of the trial transcript and the papers submitted on this petition, it is clear to me that Coppin's fifth amendment right against self incrimination was not violated. Under the fifth amendment, a prosecutor's comment on an accused's failure to testify in his own behalf is not very different from a prosecutor's comment about the accused's failure to make an exculpatory statement at the time of arrest. *Gillison v. United States*, 399 F.2d 586, 587 (D.C.Cir. 1968). "[A]n inference of guilt may not be drawn from a failure to speak or to explain when a person has been arrested." *United States v. Mullings*, 364 F.2d 173, 175 (2d Cir. 1966). The comments by the prosecutor in this case, however, were made in fair reply to testimony adduced by the defense counsel during the trial. As a result, the comments were permissible.

The issue of Coppin's silence was not introduced by the People, but by the defense in its own examination of Officers Greco and Caruso. It was further elaborated on in the defense summation. The defense clearly attempted to use Coppin's silence as an argument that the police investigation and the People's case against Coppin were

**58**

weak. Having opened this door wide, Coppin cannot now complain because the prosecutor stepped through it. *Bradford v. Stone,* 594 F.2d 1294, 1296 (9th Cir. 1979); *United States v. Armedo–Sarmiento,* 545 F.2d 785, 793 (2d Cir. 1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977). A study of the summation in context convinces me that "the prosecutor's statement was still well within the bounds of fair comment on the strength of the evidence." *Leon v. Kuhlmann,* 443 F.Supp. 50, 57–58 (S.D.N.Y.1977). The fifth amendment is a shield which protects an accused from forced self–incrimination. It is not a sword which he may use with impunity to attack the evidence presented against him.

Coppin's petition to this Court also lists as grounds for seeking this writ the insufficiency of the evidence against him; the trial judge's abuse of discretion in ruling at a *Sandoval* hearing that Coppin could be examined about prior convictions for assault, resisting arrest, disorderly conduct, and loitering for the purpose of gambling; and that the evidence against him would support, at best, a conviction for criminal facilitation. These grounds were apparently transplanted from Coppin's brief on his unsuccessful appeal to the First Department. On this petition, he alleges no facts to support these contentions, and his brief addresses only the fifth amendment grounds. Such conclusory assertions cannot justify the issuance of the writ requested. Furthermore, a review of the trial transcript shows that these allegations are without merit.

Accordingly, the petition for a writ of habeas corpus is in all respects denied.

SO ORDERED.