OPINION OF THE COURT
Irving Lang, J.
The primary question before this court on the defendants’ motion to inspect the Grand Jury minutes is what size must a sawed-off shotgun be before it will qualify as a prohibited “firearm” under subdivision 3 of section 265.00 of the Penal Law. The statute reads that a “‘firearm’ means any pistol, revolver, or sawed-off shotgun or other firearm of a size which may be concealed upon the person, except an antique firearm.”
Although the New York Joint Legislative Committee on Firearms and Ammunition reported in 1965 that New York had “flatly outlawed all sawed-off shotguns,”[1] the statute does not “flatly” outlaw all sawed-off shotguns, but only those “which may be concealed upon the person” *653 (emphasis supplied). Lacking a weapon-sized standard as a guide, trial and appellate courts have published a number of decisions which are inconsistent with each other, misinterpret each other, and often are factually and historically inaccurate.
This legislative failure has triggered a double attack on the indictment.
First, it is claimed that the statute is unconstitutionally vague.
Second, it is claimed that the evidence before the Grand Jury was insufficient as a matter of law to show that the weapon in question was capable of being concealed upon the person.
THE FACTS
The facts in this case are quite straightforward. On August 18, 1979, at approximately 4:30 a.m., the defendants Linda Cortez and Candida Delmoral were sitting in an automobile in upper Manhattan. In the center floor of the car a police officer observed a part of a sawed-off shotgun partially hidden under the seat. The defendants were arrested and indicted for criminal possession of a weapon in the third degree.
The weapon was a .12 gauge Browning semiautomatic shotgun loaded with four live rounds. Both the barrel and the stock had been cut down. The barrel is 13% inches in length and the over-all length is 26% inches. Both defendants are 5 feet 4 inches tall. Cortez gave her weight as 122 pounds and Delmoral gave her weight as 155 pounds.
SHOTGUNS
Before analyzing the complex legislative and judicial history of the statutes in question, I believe that it would be helpful to discuss the nature of the shotgun and its illegitimate progeny.
Shotguns are long-barrelled firearms designed to be fired from the shoulder. The Browning Company sells shotguns with barrels ranging from 20 inches to 36 inches. The stocks are usually about 14 inches. The gauge of the shotgun refers to the inside bore diameter of the barrel. A 10-gauge shotgun has a bore of .775 of an inch; 12-gauge *654 .725; 16-gauge .665; 20-gauge .615; 28-gauge .545; .410 bore .410.
All shotgun barrels are chambered to accept shells of specific length. Ignited by a fast acting smokeless powder, shells consist of a number of lead cylindrical pellets of various sizes. The smallest size is .08 inch and the largest .33 inch (00 buckshot). The number of lead pellets per load range from over 730 for the smallest pellets to 15 for the 00 buckshot (Browning catalogue 1979).
Unlike the rifle, the shotgun is a short-range weapon. Most shotguns have a “choke” at the end of the barrel which tends to constrict the dispersal of the pellets when the gun is fired. Thus a “full choke” should place 65% to 75% of the pellets in a 30-inch circle 40 yards distant. Other chokes will cause less constriction, and no choke at all would cut the area to 25% to 30%. In other words, the choke performs much the same function as the variable nozzle on a water hose.
The choke is particularly noteworthy as it applies to sawed-off shotguns, since cutting the barrel will remove the existent choke and if fired cause a wider dispersion of pellets and thereby create greater danger to anyone in the path of the shot. While barrel length has little to do with shot dispersal,[2] the removal of choke is quite significant.
SAWED-OFF SHOTGUNS
As early as 1898, Winchester, the famous firearm manufacturer, had introduced a shotgun with a 20-inch barrel, which it promoted as a police weapon, useful in riot control. This type of shortened weapon was adopted by the American expeditionary forces during World War I and used as a trench gun. Its appearance at the front prompted the German Government to lodge an official complaint, based on humanitarian grounds, that the use of the gun was contrary to the laws of war.[3]
By the mid-1920’s the sawed-off shotgun had found favor in criminal circles. This gun, unlike those manufactured with short barrels, attained its characteristic short length *655 through the simple use of a hacksaw. As one writer described the gangster weapon, it was “compact and effective even without careful aiming *** it could be used from moving vehicles. Clyde Barrow perfected a ‘quick draw’ with one concealed in a special holster sewn into his trousers.”[4]
It is evident that the sawed-off shotgun is a particularly dangerous weapon for two reasons, apart from the danger associated with any weapon which can cause death. First, the removal of the choke, by cutting the barrel, exposes potential victims to greater peril. Second, cutting the barrel and/or the stock makes it easier to conceal.
There simply is no legitimate use for the sawed-off shotgun. Thus contrary to popular opinion and a Legislature which is seemingly reluctant effectively to clarify the gun laws because of a fear of the “gun lobby”, the National Rifle Association (NRA) does not lobby against legislative restrictions with respect to sawed-off shotguns.
“There is no legitimate sporting use” for the sawed-off shotgun described in this case, according to Robert Sears, Senior Associate Technical Editor of the NRA’s official journal, “The American Rifleman”. Although shooting from a car would provide certain leverage for a shotgun whose stock had been cut down, as Mr. Sears put it: “You don’t shoot game from a car.” The NRA will not advertise any weapon which is not meant for a legitimate sporting purpose.
With this background we can now examine the legislative, constitutional, and judicial history of sawed-off shotguns.
LEGISLATIVE HISTORY
Sawed-off shotguns first joined the galaxy of weapons recognized as dangerous by the State of New York through an amendment to the Penal Law passed during the legislative session of 1931.[5] The debut of the sawed-off shotgun iii New York’s Penal Code preceded by three years its initial appearance in a Federal statute, the National Firearms Act of 1934. That act prohibited sawed-off shotguns which *656 had either an over-all length of less then 26 inches or a barrel(s) of less than 18 inches.
As indicated, although the New York Joint Legislative Committee on Firearms and Ammunition reported in 1965 that New York had “flatly outlawed all sawed-off shotguns,” the Penal Law, unlike the Federal statute, has never defined the prohibited features of a sawed-off shotgun — its size. As a result, the Legislature’s proclaimed accomplishment of having flatly outlawed sawed-off shotguns may be viewed as rhetoric rather than reality, since concealability is essential for liability.
The issue of a weapon’s concealability has occupied a substantial amount of legislative time since the inception of the Penal Code in 1881. Although concealability is the touchstone of illegally possessed weapons, it is interesting to note that just the reverse was the basis of early colonial law. Under English common law, it was a misdemeanor to walk about in public openly armed, a situation which might “terrorize the King’s subjects.” To carry a concealed weapon, however, was no crime at all.[6] This prohibition was adopted in colonial Massachusetts and re-enacted after the American Revolution. The first State to enact legislation prohibiting concealed weapons was the frontier State of Kentucky in 1812.
A concealed weapons provision, section 412, was included in the New York Penal Code of 1881. It read: “A person who carries concealed about his person any kind of fire-arms * * * such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.” (Emphasis supplied.)
Constructive possession of weapons was prohibited for the first time in New York in 1911 by the addition of subdivision 4 to section 1897 of the Penal Law. Henceforth it was a crime to have in one’s possession, unregistered, “any pistol, revolver or other firearm of a size which may be concealed upon the person”. Contemporaneous interpretation of the new statute by the courts (People ex rel. Darling v Warden of City Prison of City of N.Y., 154 App Div 413) indicated that all possession of a concealable *657 weapon was prohibited, whether the weapon was in one’s home, in a drawer, or actually carried openly or concealed on the person. The emphasis by the court was on weapons used for criminal purposes (in Darling it was a revolver), and not on larger guns commonly used by the military. Holding that an unlicensed revolver in the home was concealable, the Darling court said of the new amendment (supra, at p 423): “There had been for many years upon the statute books a law against the carriage of concealed weapons *** It did not seem effective in preventing crimes of violence in this State. Of the same kind and character, but proceeding a step further with the regulatory legislation, the Legislature has now picked out one particular kind of arm, the handy, the usual and the favorite weapon of the turbulent criminal class”.
By 1931, however, amidst news stories of gangland rampages and public outrage, the Legislature included the sawed-off shotgun, imitation pistol, and the machine gun in its repertoire of dangerous weapons prohibited when held with an intent to use unlawfully. The Penal Law then read that “A person who *** with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon, is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.” (Penal Law, § 1897, subd 1.)
By 1936 another amendment reflecting the stepped-up criminal activity of the time was added to the Penal Law (§ 1898-a). This section created a presumption of illegal possession of weapons when they were found in an automobile. The Legislature specified these weapons to be pistols, machine guns, sawed-off shotguns, but not ordinary shotguns or rifles.
In 1962 the Legislature, by now as confused as were the courts by the three score or more, often conflicting, amendments to the dangerous weapons sections of the Penal Law, formed a Joint Legislative Committee on Firearms and Ammunition.
As a result of its findings, the committee recommended that a sawed-off shotgun be classed as a “firearm”, “so that *658 possession is criminal regardless of intent.” The committee’s explanation for the inclusion of sawed-off shotguns (as it was to be applied to subdivision 3 of section 1896 and subdivisions 2 and 3 of section 1897) was to facilitate standardization: “by its self-evident adaptation, this weapon can be ‘concealed upon the person.’ Even the narrow definition of ‘firearm’ that excluded pistols and revolvers for tax purposes in the National Firearms Act includes a sawed-off shotgun.”[7]
As of the 1963 legislative session, the earlier gun law was repealed and by 1965 newly numbered sections replaced the old. Section 1896, for example, became section 265.00. This newly codified section concerning dangerous weapons included a definition for a shotgun and a definition for a firearm: “[A] ‘Firearm’ means any pistol, revolver, sawed-off shotgun or other firearm of a size which may be concealed upon the person, except an antique firearm.”
CONSTITUTIONALITY
Since the Legislature has not set an objective standard as to concealability, the question arises as to whether a subjective standard is constitutionally vague. For example, does the statute mean that a 6-foot 6-inch basketball player would be liable for possession of a sawed-off shotgun, but that a 5-foot jockey would not be accountable for possessing the same gun? Would liability be imposed on an individual who was wearing a raincoat but not if he was only clad in shorts and a T-shirt?
While there are no New York cases specifically addressing the issue, the United States Court of Appeals for the Ninth Circuit and the Supreme Court of the United States have considered the question. In United States v Powell (501 F2d 1136), the Ninth Circuit held that a Federal statute (US Code, tit 18, § 1715), which provided that “Pistols, revolvers, and other firearms capable of being concealed on the person are nonmailable”, was constitutionally vague. The court stated (supra, p 1.137):
*659 “Although little question can be raised as to the conceal-ability on the person of a pistol or revolver in common recognition of the normal limits of their size, the statutory prohibition as it might relate to sawed-off shotguns is not so readily recognizable to persons of common experience and intelligence * * *
“To require Congress to delimit the size of the firearms (other than pistols and revolvers) that it intends to declare unmailable is certainly to impose no insurmountable burden upon it; and its failure to do so is an infirmity in draftsmanship of constitutional proportions.”
However, the United States Supreme Court reversed the Ninth Circuit. In United States v Powell (423 US 87, 93) Justice Rehnquist noted for the majority that the statute “intelligibly forbids a definite course of conduct: the mailing of concealable firearms. While doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the statute gave respondent adequate warning that her mailing of a 22-inch-long sawed-off shotgun was a criminal offense.” The court rejected the reasoning of the Ninth Circuit as to whether the “person” referred to in the statute to measure capability of concealment was “the person mailing the firearm, the person receiving the firearm, or, perhaps, an average person, male or female, wearing whatever garb might be reasonably appropriate, wherever the place and whatever the season” (501 F2d 1136, 1137, supra). The Supreme Court stated (supra, p 93): “But we think it fair to attribute to Congress the commonsense meaning that such a person would be an average person garbed in a manner to aid, rather than hinder, concealment of the weapons.”
The holding of the Supreme Court in Powell, therefore, forecloses any constitutional attack on the statute.
JUDICIAL HISTORY
Judicial interpretations of the sawed-off shotgun statute have resulted in a collage of conflicting decisions. In People v Palermo (36 AD2d 565), the Fourth Department held that a shotgun with a barrel of a little over 18 inches found in a car was not of a size which could be concealed on the person and reversed the defendant’s conviction. The court held *660 (supra, p 565) that the legislative intent “was directed to a [particular] type of weapon which could be concealed upon the person and not to the particular shotgun in this case.” While the over-all length of the weapon was not given, the court (supra, p 565) reached its conclusion “[i]rom our inspection of the gun”.
Relying on Palermo, the District Court of Suffolk County in People v Roberts (73 Misc 2d 500, app dsmd 79 Misc 2d 243), held that a 23V2-inch sawed-off shotgun was not concealable on the person.
Because of the limited description of the weapon in Palermo, the Roberts court (supra, p 502), as did Palermo, referred to Judge Sobel’s decision in People v Raso (9 Misc 2d 739, 741), which in turn quoted People ex rel. Darling v Warden of City Prison of City of N.Y. (154 App Div 413, 426, supra), as follows: “‘it would be perfectly legal to keep at one’s bedside or in a cabinet a blunderbuss or a horse pistol, or whatever modern weapons correspond in size to those ancient arms, but unlawful to so keep their smaller relative of a size that may be concealed upon the person’.”
Holding that the shotgun in the Roberts case (supra, p 502) far more nearly “approximates the ancient blunderbuss or horse pistol than the modern revolver”, the court acquitted the defendant.
The problem with this analysis is that the court in Raso did not mention that the “blunderbuss” quote from Darling was from the dissent, not the majority opinion. More important, the dissent by Justice Scott in Darling was inaccurate.
The muzzle-loaded horse pistol was a common personal weapon of 16th and 17th Century Europe. Usually horse pistols were made in pairs, were carried in separate holsters in front of the saddle and were classified as small arms.[8] Although added length gave a gun greater accuracy when fired from a horse, guns with minimum lengths of nine inches overall (barrel six inches) existed, according to historian Professor Phil Klingle of John Jay College. Horse *661 pistols were most popular during the early 17th Century when they were quite long. The Metropolitan Museum of Art holds one such horse pistol, for example, which measures 29 inches overall with a barrel length of 18% inches. By the early 18th Century horse pistols were being supplanted by pistols which could be converted into rifles. By the early 19th Century horse pistols were completely replaced by other longer guns, often carbines, which could still be carried on the horse but were classified as long arms. Although such guns were carried on horseback, they were no longer labeled as horse pistols.[9]
The blunderbuss, derived from the German Donner Büchse or thunder barrel, was the grandfather of the shotgun. It was a short, muzzle-loading, cannon type musket with a large bore and a flaring muzzle, used primarily in the 17th and 18th Centuries. When loaded with lead balls, broken glass, nails and stones, the blunderbuss spread destruction in its path at short ranges.[10] Use of the cannon-length models was mainly for naval purposes, these heavy guns being mounted on swivels on a ship’s bow. The blunderbuss was distinctly not a sporting weapon.[11] Models smaller than the cannon type, measuring approximately 30 inches overall with 14-inch barrels, were used by the English military up till and possibly including the American Revolution. But the blunderbuss type gun was also manufactured, mainly for the civilian population, in a pistol version.
It would appear, therefore, that contrary to Justice Scott’s comment that these ancient weapons could be possessed legally because of their size, the shorter models of both the blunderbuss and the horse pistol would have been forbidden by the 1911 penal statute which prohibited the possession of any unregistered “pistol, revolver or other firearm of a size which may be concealed upon the person”.
To continue with the judicial history of the statute, the Criminal Court in People v Caffrey (73 Misc 2d 504) held that one who possessed a sawed-off rifle of an over-all length of 16 inches should be held for Grand Jury action. *662 The court properly determined that while there is a clear statutory exception for full-size rifles (which were never intended to be covered by the statute; see People v Raso, 9 Misc 2d 739, supra), subdivision 3 of section 265.00 of the Penal Law does not immunize those who cut a rifle to concealable size.
In Matter of Peabody (86 Misc 2d 520), the Family Court (Queens County) dismissed a petition where a juvenile possessed a sawed-off shotgun 221/4 inches long. Citing Palermo and Roberts, the court stated (supra, p 524) that “There is considerable case authority to the effect that a sawed-off shotgun of more than 18 inches in length is not a concealed weapon as defined in subdivision 3 of section 265.00 of the Penal Law.” In fact, there is no case authority to that effect. In Palermo, all the court stated was that the barrel was 18 inches. It obviously ruled on the over-all length. Nor did Roberts allude to any “18 inch rule.”
Indeed, we can ascertain the over-all length of the Palermo shotgun from the Fourth Department’s decision in People v Eldridge (53 AD2d 1037, 1038), which reversed a conviction for possession of a 27-inch sawed-off shotgun, holding as it did in Palermo, that “Our examination of the firearm in question convinces us that the statute is not directed to the weapon which defendant possessed.” The court pointed out (supra, p 1038) that the weapon in Palermo has the same “measurements * *• * as in the instant case”.
With respect to the First Department, scant appellate law exists. In People v Leon (53 AD2d 809), the court upheld a conviction without opinion involving a sawed-off rifle 19V2 inches long. (Leon v Kuhlmann, 443 F Supp 50 [petition for habeas corpus denied].) In People v Cohen (57 AD2d 790 [conviction revd on other gounds]),- the court held, without discussion, that it was appropriate to submit concealability to a jury of a shotgun 22% inches in length (length from trial record, not in written opinion).
Relying on Cohen (supra), the Supreme Court, New York County, held that a shotgun 27 inches long created a jury question. (People v Ahern, 104 Misc 2d 13.) The court specifically declined to follow the Fourth Department in Palermo and Eldridge (supra). Rather, it preferred to “ex *663 tend the First Department ruling in Cohen (supra) to be applicable here notwithstanding the differences in the sizes of the weapons.” (People v Ahern, supra, p 14.)
Interestingly, none of the above cases involved weapons actually concealed on the person of the defendant. In a recent case, however, the Supreme Court, Queens County, logically concluded that a 22-inch sawed-off shotgun actually concealed on the person was a concealable weapon. (People v Davis, 107 Misc 2d 1.)
CONCLUSION
Having traversed the thorny legislative, constitutional and judicial thicket, it is clear that the law in New York as to the concealability of sawed-off shotguns is unclear. The courts themselves have been unable to give much guidance in this determination. As such we have an olio of opinions without any apparent unifying factors. Is there a solution to this maze?
One obvious solution is legislative. Since no one has any use for sawed-off shotguns, be it the public at large, law enforcement or the NRA, there is no reason why our Legislature could not easily solve the problem by adopting the same law that is standard in 27 States[12] and by the National Firearms Act. Those laws simply prohibit the possession of a sawed-off shotgun with a barrel of less than 18 inches or an over-all length of less than 26 inches. No complex judicial agonizing is required to enforce those statutes. All that is needed is a ruler. Thus in United States v Lamb (294 F Supp 419), the defendant was convicted of violating the National Firearms Act (US Code, tit 26, § 5821) by possessing a sawed-off shotgun with a barrel 17 900/1000 inches long. The court held that the act of Congress must be strictly construed and that if Congress wanted to exempt firearms of “nearly” 18 inches it could have done so.
But even new legislation can have no effect on the instant case. While the cases are contradictory, it is possible to discern certain patterns. For example, no case has been found which has held a sawed-off shotgun of less than *664 18 inches not concealable. On the other extreme, no case has been found which has upheld a conviction of a length of greater than 24 inches. It is within the 18 to 24 inch range where there are conflicting findings. It would seem reasonable, therefore, to break up the size issue into three categories.
Any sawed-off shotgun up to 18 inches in length would appear to be presumptively concealable.
Any sawed-off shotgun between 18 and 24 inches in length would presumptively create a fact question for Judge or jury.
Any sawed-off shotgun in excess of 24 inches would be considered presumptively not concealable in the absence of special circumstances relating- to dress, or other factor which would manifest concealability.
Applying these criteria to the instant case, the shotgun is 26% inches long, approximately half the height of each of the defendants. (The J. C. Penny Co. sells .410 shotgun 28% inches long, 1980 J. C. Penny catalogue, p 736.) There was no evidence presented to the Grand Jury indicating that the defendants on the summer night of their arrest were “garbed in a manner to aid, rather than hinder, concealment of the weapons” (United States v Powell, 423 US 87, 93, supra.)
The Grand Jury minutes are therefore legally insufficient to establish concealability with respect to each of the defendants and the indictment is therefore dismissed.[13]

. New York Legis Doc, 1965, No. 6, Report of the Joint Legislative Committee on Firearms and Ammunition, “The Old Sullivan Law and the New Statute.” (See, also, NY Legis Doc, 1964, No. 12.)

. Interview with Mr. Robert Sears, Senior Associate Technical Editor, “The American Rifleman”.

. Kennett, The Gun in America (Greenwood Press, 1975), p 202.

. The Gun in America, supra.

. L 1931, ch 435.

. Comparative Law in the United States.

. New York Legis Doc, 1962, No. 29, p 21, Report of the Joint Legislative Committee on Firearms and Ammunition.

. Interview with Assistant Curator of Arms and Armaments, Metropolitan Museum of Art, New York City.

. Ibid.

. Chapel, Gun Collecting (Coward-McCann, 1939), p 124.

. Pollard, A History of Firearms (Houghton Mifflin Co., 1926), p 11.

. Ala, Ariz, Cal, Col, Conn, Del, Fla, Ga, Hawaii, 111, la, La, Md, Mass, Mich, Neb, Nev, NJ, NC, Ohio, RI, SC, SD, Tenn, Tex, Va, Wyo.

. The court wishes to express its appreciation to the following people for their generous co-operation: H. G. Williams, retired president of the Browning Corp., Morgan, Utah; Robert Sears, Senior Associate Technical Editor, “The American Rifleman”; Asst. District Attorney Elizabeth Marsh, who surveyed the laws relating to sawed-off shotguns in every State and under Federal law; and Lael Scott of the Cardozo Law School, whose research efforts were invaluable.